1
2
3
4
5
6                    UNITED STATES DISTRICT COURT

7                        DISTRICT OF NEVADA

8                              * * *

9   UNITED STATES OF AMERICA,        )
                                     )    Case No. 2:16-cr-00316-JCM-NJK
10             Plaintiff,            )
                                     )
11  vs.                             )    REPORT &  RECOMMENDATION
                                     )
12  JUAN ANTONIO ZAMORA,             )
                                     )    (Docket No. 18)
13             Defendant.            )
    _____)

14

15         This matter was referred to the undersigned Magistrate Judge on Defendant's Motion to

16  Suppress Evidence.  Docket No. 18.  The Court has considered Defendant's motion, the United

17  States' response, Defendant's reply, the evidence adduced at the evidentiary hearing on this matter,

18  and the parties' arguments.  Docket Nos. 18, 20, 22, 33, 48.[1]

19  **I.       BACKGROUND**

20         **A.      Testimony of Officer Chapman**[2]

21         On October 7, 2015, at approximately 11:40 p.m., Las Vegas Metropolitan Police

22  Department (LVMPD) Officer Travis Chapman, who was assigned to the Problem Solving Unit and

23  dressed in plainclothes, was the passenger in an unmarked LVMPD vehicle in the area of Lamb and

24  Stewart in Las Vegas.  Hearing Tr. (5/3/2017) at 10:28-10:29 a.m., 10:57 a.m.  Officer Chapman and

25

26

27         [1]Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant
    date and time of the hearing, as no written transcript has been prepared.

28         [2]Although Detective Chapman is now a detective, he was a police officer at the time of the
    events at issue here.  Accordingly, the Court refers to him as "Officer," rather than "Detective."

his partner, LVMPD Officer[3] John Robinson, had received an anonymous Crimestopper tip that

narcotics sales were being made out of a certain trailer, so they planned to conduct surveillance on

the trailer. Hearing Tr. (5/3/2017) at 10:29 a.m., 10:34 a.m., 10:57 a.m. The officers, additionally,

had other information that corroborated the tip. Hearing Tr. (5/3/2017) at 11:00 a.m. The officers

went to the trailer park where the trailer was located and observed an unregistered 2004 Chevrolet

pickup truck, bearing a temporary paper tag, in the parking lot near the residence. Hearing Tr.

(5/3/2017) at 10:30-10:31 a.m., 11:02 a.m. In Officer Chapman's experience, many of the paper tags

in that area of the city are fictitious and the numbers on this tag were "enlarged." Hearing Tr.

(5/3/2017) at 10:31-10:32 a.m., 11:20 a.m. Further, the officers could not determine if the paper tag

was legitimately issued without stopping the truck. Hearing Tr. (5/3/2017) at 11:03 a.m., 11:20 a.m.

The officers first observed the occupants of the truck as they walked out of the target trailer

and entered the truck. Hearing Tr. (5/3/2017) at 10:59-11:00 a.m. The CAD indicates that three

occupants were in the truck, but only two occupants were in the truck. Hearing Tr. (5/3/2017) at

11:01-11:02 a.m., 11:08 a.m. The officers followed the truck out of the trailer park, where it turned

southbound on Lamb. Hearing Tr. (5/3/2017) at 10:32 a.m., 11:02 a.m., 11:05 a.m. As the truck

approached Stewart, it failed to use its turn signal when it turned into a private drive to avoid the red

light at Stewart and Lamb. Hearing Tr. (5/3/2017) at 10:32 a.m. The truck cut through a strip mall

parking lot, without making any attempt to stop at any of the businesses in the strip mall or even

slowing down, to get to Stewart, where it turned westbound. Hearing Tr. (5/3/2017) at 10:32-10:33

a.m., 11:05 a.m., 11:21 a.m. The officers followed the truck through the parking lot. Hearing Tr.

(5/3/2017) at 11:05 a.m. The officers then stopped the truck on Stewart for the traffic violations of

failing to use a turn signal and turning into the parking lot to avoid a red light. Hearing Tr.

(5/3/2017) at 10:32-10:33 a.m., 11:19-11:20 a.m. Additionally, the officers stopped the truck

because the numbers written on the paper tag appeared abnormally fat, which caused them to believe

the numbers had been changed, and because the occupants of the truck were observed leaving a

trailer that the officers believed was being used to sell drugs. Hearing Tr. (5/3/2017) at 11:19-11:20

---

[3]Although Detective Robinson is now a detective, he was a police officer at the time of the events at issue here. Accordingly, the Court refers to him as "Officer," rather than "Detective."

1  a.m.

2      The truck stopped on the side of the road in front of an apartment complex on Stewart, and

3  the officers' vehicle stopped approximately one car length behind the truck.  Hearing Tr. (5/3/2017)

4  at 10:35-10:36 a.m.  Officer Chapman, who was wearing a tactical vest with a badge on front and

5  the word Police on the back, walked up to the passenger side of the truck with his badge in his hand,

6  while Officer Robinson approached the driver's side.  Hearing Tr. (5/3/2017) at 10:36-10:37 a.m.,

7  11:08 a.m.  As Officer Chapman approached the truck, he smelled a strong, pungent odor of burned

8  marijuana coming from the truck.  Hearing Tr. (5/3/2017) at 10:36 a.m., 10:38 a.m., 11:09 a.m.,

9  11:11 a.m.  After working in the area for six years, Officer Chapman recognizes the smell of

10 marijuana, and also recognizes the smell of burned marijuana.  Hearing Tr. (5/3/2017) at 10:38 a.m.

11 The officers did not ask Defendant or his passenger if either one of them possessed a medical

12 marijuana card.  Hearing Tr. (5/3/2017) at 11:09-11:10 a.m.

13     Defendant Juan Antonio Zamora was the driver of the truck.  Hearing Tr. (5/3/2017) at 10:39

14 a.m.  When the officers started speaking with them, both Defendant and his passenger appeared to

15 be extremely nervous.  Hearing Tr. (5/3/2017) at 10:37 a.m.  While it is common for people who are

16 stopped by police to be nervous to a certain extent, Defendant and his passenger were nervous

17 "above and beyond" what is normal.  Hearing Tr. (5/3/2017) at 11:10 a.m.  As a result, Officer

18 Robinson decided to pull both occupants out of the truck.  Hearing Tr. (5/3/2017) at 10:37 a.m.,

19 11:12 a.m.  Officer Chapman then became the cover officer, providing security while his partner

20 spoke with the occupants of the truck.  Hearing Tr. (5/3/2017) at 10:39 a.m., 11:13 a.m.  Officer

21 Robinson asked Defendant and his passenger for their identification, and also asked the passenger

22 if he had any weapons on his person and if he would consent to a pat down.  Hearing Tr. (5/3/2017)

23 at 10:40 a.m., 11:13 a.m.  The passenger gave consent for a pat down and, just before Officer

24 Robinson patted him down, the passenger said that he had narcotics in his pocket.  Hearing Tr.

25 (5/3/2017) at 10:40 a.m., 11:13 a.m.  A small amount of methamphetamine was then recovered from

26 the passenger.  Hearing Tr. (5/3/2017) at 10:41 a.m., 11:14-11:15 a.m.  The passenger was placed

27 under arrest for possession of a controlled substance.  Hearing Tr. (5/3/2017) at 10:41 a.m.

28 Defendant said that he had been in trouble in the past.  Hearing Tr. (5/3/2017) at 10:41 a.m.

1        While Officer Robinson was interacting with Defendant and his passenger and Officer

2 Chapman acted as cover, Officer Chapman noted that the doors of the truck were open. Hearing Tr.

3 (5/3/2017) at 10:43 a.m. The front doors on both the driver's side and the passenger's side of the

4 truck had been left open by the occupants when the officers removed the occupants from the truck.

5 Hearing Tr. (5/3/2017) at 10:43 a.m. Since the doors were open, Officer Chapman could see inside

6 the truck. Hearing Tr. (5/3/2017) at 10:43 a.m.

7        The officers determined that they had probable cause to search the truck due to the odor of

8 marijuana emanating from the truck, the methamphetamine on the passenger, the baggie in front of

9 the driver's seat that Officer Chapman could see through the open door of the truck, and the white

10 flakes near the baggie that appear consistent with methamphetamine. Hearing Tr. (5/3/2017) at

11 10:52-10:53 a.m., 11:17 a.m., 11:22-11:23 a.m. The officers therefore searched the truck for

12 narcotics. Hearing Tr. (5/3/2017) at 10:52 a.m. On the driver's side floorboard in front of the seat,

13 Officer Chapman could see a small piece of a plastic grocery bag with a knot in it. Hearing Tr.

14 (5/3/2017) at 10:48-10:49 a.m. Officer Chapman is aware that narcotics sellers and users commonly

15 use this method as a cheap way to store methamphetamine. Hearing Tr. (5/3/2017) at 10:49 a.m.,

16 11:22 a.m. Also, if someone is pulled over by the police, it is easy to rip the plastic bag open and

17 dump it out so that no evidence is left, which is a common practice in that area of the city. Hearing

18 Tr. (5/3/2017) at 11:22 a.m. Additionally, white flakes, which appear consistent with

19 methamphetamine, were visible on the floorboard of the driver's side of the truck. Hearing Tr.

20 (5/3/2017) at 10:49 a.m., 11:23 a.m. Rounds of ammunition were located in the truck. Hearing Tr.

21 (5/3/2017) at 10:50 a.m. A revolver was found concealed inside the fuse box of the truck, on the

22 driver's side of the truck under the fuse box cover. Hearing Tr. (5/3/2017) at 10:50-10:51 a.m.,

23 11:18 a.m. The officers removed the fuse box cover because they believed they had probable cause

24 to search the truck for narcotics, and the fuse box was a location where narcotics could be hidden.

25 Hearing Tr. (5/3/2017) at 10:51-10:53 a.m.

26        After observing the firearm in the fuse box, the officers sought a telephonic state search

27 warrant for the truck, with Officer Robinson as the affiant. Hearing Tr. (5/3/2017) at 10:54 a.m.,

28 10:56 a.m. A state judge issued the search warrant. Hearing Tr. (5/3/2017) at 10:55 a.m. Once the

1  officers obtained the search warrant, they searched the rest of the truck.  Hearing Tr. (5/3/2017) at

2  10:55 a.m.  During this search, they recovered the firearm from the fuse box, and found that it was

3  fully loaded and ready to fire. Hearing Tr. (5/3/2017) at 10:54 a.m.  They also found a glass smoking

4  pipe with methamphetamine residue.   Hearing Tr. (5/3/2017) at 10:48 a.m., 11:17-11:18 a.m.

5  Officers did not, despite smelling burned marijuana, find any marijuana in the truck.  Hearing Tr.

6  (5/3/2017) at 10:55 a.m., 11:11 a.m.  It is not legal to drive while smoking marijuana in Nevada.

7  Hearing Tr. (5/3/2017) at 10:55 a.m.

8        **B.**      **Testimony of Officer Robinson**

9        On October 7, 2015, at approximately 11:40 p.m., LVMPD Officer Jonathan Robinson, who

10  was assigned to the Problem Solving Unit and dressed in plainclothes, was the driver of an unmarked

11  LVMPD vehicle in the area of Lamb and Washington in Las Vegas.   Hearing Tr. (5/3/2017) at

12  11:27-11:28 a.m., 11:30 a.m., 12:01 p.m.  He was there, along with his partner, to investigate an

13  anonymous Crimestopper tip that a certain trailer in a trailer park was being used to deal illegal

14  narcotics.  Hearing Tr. (5/3/2017) at 11:28 a.m., 12:00 p.m.  The tip did not give information about

15  any particular individuals.  Hearing Tr. (5/3/2017) at 12:01 p.m.  The tip also did not give any

16  information about any vehicles associated with the trailer.  Hearing Tr. (5/3/2017) at 12:01 p.m.

17        Officer Robinson drove into the trailer park to corroborate the information he had been given.

18  Hearing Tr. (5/3/2017) at 11:28 a.m., 12:01 p.m.  As he approached the trailer, he saw a gold 2004

19  Chevrolet pickup truck parked in front of the trailer, and two males going from the porch of the

20  trailer to the truck two times.  Hearing Tr. (5/3/2017) at 11:30 a.m., 11:31 a.m., 12:02 p.m., 12:04

21  p.m.  Officer Robinson drove to the back of the trailer park and, as he turned around to try to

22  establish a location to watch the trailer, he saw that the truck was leaving.  Hearing Tr. (5/3/2017)

23  at 11:30 a.m., 12:04 p.m.  Officer Robinson followed the truck out of the trailer park in an attempt

24  to conduct a stop to corroborate the information in the Crimestopper tip.  Hearing Tr. (5/3/2017) at

25  11:31 a.m., 12:04-12:05 p.m.

26        Officer Robinson followed the vehicle as it traveled Southbound on Lamb.  Hearing Tr.

27  (5/3/2017) at 11:31 a.m., 12:06 p.m.  Officer Robinson and his partner discussed whether they

28  should continue to follow the truck or return to the trailer.  Hearing Tr. (5/3/2017) at 11:32 a.m.

1   They decided to follow the truck, and to conduct a stop if it committed a violation.  Hearing Tr.

2   (5/3/2017) at 11:32 a.m., 12:06 p.m.  At the intersection of Stewart and Lamb, Officer Robinson saw

3   the truck turn right without using a turn signal into a parking lot to avoid a red light.  The truck went

4   through the parking lot without stopping at any businesses, or slowing down, and turned right onto

5   Stewart.  Also, Officer Robinson noted that the truck had a paper tag, meaning that it was not

6   registered.  Hearing Tr. (5/3/2017) at 11:31-11:33 a.m., 12:07-12:08 p.m., 12:09 p.m., 12:34 p.m.

7   As a result, Officer Robinson activated his light and siren and stopped the truck for the traffic

8   violations of failure to use a turn signal and using private property to avoid a red traffic signal.

9   Hearing Tr. (5/3/2017) at 11:33-11:34 a.m., 12:10 p.m., 12:34 p.m.  The paper tag, in and of itself,

10  was not a violation, but officers need to verify its validity through records checks.  Hearing Tr.

11  (5/3/2017) at 11:34 a.m., 12:08 p.m.

12      The truck stopped directly below a street light and no adverse weather conditions were

13  present that night.  Officer Robinson parked about 10-15 feet behind the truck and the officers

14  walked up to the truck, wearing a tactical vest with police markings and a badge.  Hearing Tr.

15  (5/3/2017) at 11:35-11:36 a.m.  Officer Robinson went to the driver's side, told Defendant why he

16  had been stopped, and asked for his driver's license, registration, and insurance.  Hearing Tr.

17  (5/3/2017) at 11:37 a.m., 12:11 p.m.  Defendant looked for the requested documents, but was unable

18  to produce them.  Hearing Tr. (5/3/2017) at 11:38-11:39 a.m., 12:11 p.m.  He told Officer Robinson

19  that he was coming from somewhere and trying to get money from a friend.  Hearing Tr. (5/3/2017)

20  at 11:39 a.m.

21      Officer Robinson could smell a pungent smell of marijuana coming from the truck as soon

22  as he reached the tailgate of the truck.  Hearing Tr. (5/3/2017) at 11:39 a.m., 12:10 p.m., 12:14 p.m.

23  The smell was that of burned marijuana.  Hearing Tr. (5/3/2017) at 11:40 a.m.  Officer Robinson

24  asked the occupants of the truck to exit the truck and go to the patrol vehicle, which they both did.

25  Hearing Tr. (5/3/2017) at 11:40 a.m., 12:12 p.m.  When they exited, the occupants left the doors of

26  the truck open.  Hearing Tr. (5/3/2017) at 11:41 a.m.

27      When they got to the front of the patrol vehicle, Officer Robinson asked both Defendant and

28  his passenger if they had any weapons or drugs on their person or in the truck.  Defendant said he

had nothing.  Hearing Tr. (5/3/2017) at 11:42 a.m., 12:13 p.m.  The passenger initially said he had

nothing, and  when Officer Robinson asked for consent to pat them down, both agreed.  Hearing Tr.

(5/3/2017) at 11:42 a.m.  When Officer Robinson went to pat the passenger down, the passenger said

he had methamphetamine in his pocket.  Hearing Tr. (5/3/2017) at 11:43 a.m.  Officer Robinson

asked where the methamphetamine was, the passenger told him, and Officer Robinson recovered 0.1

grams of methamphetamine from the passenger.  Hearing Tr. (5/3/2017) at 11:43 a.m., 12:15 p.m.

Officer Robinson placed the passenger in handcuffs and sat him on the curb.  Hearing Tr. (5/3/2017)

at 11:44 a.m.  He then patted Defendant down and found that Defendant had no contraband on him.

Hearing Tr. (5/3/2017) at 11:44 a.m., 12:14 p.m.  Officer Robinson then sat Defendant on the curb

while he went to radio for a records check on both Defendant and the passenger.  Hearing Tr.

(5/3/2017) at 11:44 a.m.  Officer Robinson learned that Defendant had an outstanding warrant for

something to the effect of destruction of property.  Hearing Tr. (5/3/2017) at 11:44 a.m.

While they were waiting to hear back on the records checks, Officer Robinson and Officer

Chapman spoke and decided they had probable cause to search the truck for narcotics, without a

warrant.  Hearing Tr. (5/3/2017) at 11:45 a.m.  The officers based this decision on the fact that they

were involved in a narcotics investigation regarding a specific trailer, the truck had been at the

location of that trailer, the officers smelled marijuana as they were approaching the truck, the driver

could not provide any sort of identification or marijuana card, the passenger had methamphetamine

on his person, and Officer Chapman observed a baggie on the floorboard inside the truck that

indicated possession of methamphetamine.  Hearing Tr. (5/3/2017) at 11:46-11:49 a.m., 12:21 p.m.

The officers utilized the exception to the search warrant requirement afforded by *Lloyd v. State*.

Hearing Tr. (5/3/2017) at 11:49 a.m.  About 15-20 minutes elapsed between the initial stop and the

search of the truck.  Hearing Tr. (5/3/2017) at 11:49 a.m.

Officer Chapman conducted the search of the truck.  Hearing Tr. (5/3/2017) at 11:49 a.m.

While searching, he opened the fuse box, and found the butt of a handgun.  Hearing Tr. (5/3/2017)

at 11:50 a.m.  Officer Chapman immediately told Officer Robinson what he had found.  Hearing Tr.

(5/3/2017) at 11:50 a.m.  Officer Robinson placed the driver in handcuffs, because there was a

weapon in the truck, and because he nearly simultaneously received a return from records that

1    Defendant had an active warrant. Hearing Tr. (5/3/2017) at 11:50 a.m., 12:28 p.m. The officers then

2    decided to obtain a search warrant to search the truck. Hearing Tr. (5/3/2017) at 11:51 a.m. Officer

3    Robinson called Judge Eric Goodman, explained the circumstances, including the pungent smell of

4    marijuana coming from the truck and the methamphetamine on the passenger's person, and requested

5    a search warrant to search the truck for any narcotics or firearm-related evidence. Hearing Tr.

6    (5/3/2017) at 11:51-11:52 a.m., 11:55 a.m., 12:22 p.m., 12:24 p.m., 12:35 p.m. While Officer

7    Robinson wrote the search warrant affidavit, he developed more probable cause. He received the

8    records return, which confirmed that Defendant had an active warrant, as well as several felony

9    arrests. Officer Robinson could not confirm at that time whether Defendant had sustained any

10   convictions. Hearing Tr. (5/3/2017) at 11:55-11:56 a.m. Judge Goodman issued the search warrant.

11   Hearing Tr. (5/3/2017) at 11:52 a.m., 12:35 p.m.

12       Defendant asked the officers multiple times what was going on and why he was in handcuffs.

13   Hearing Tr. (5/3/2017) at 11:56 a.m., 12:26 p.m. At this point, Defendant was not free to leave, and

14   had not been read *Miranda* warnings. Hearing Tr. (5/3/2017) at 12:26-12:27 p.m.    Officer

15   Robinson explained to Defendant that there was a handgun in the fuse box of his truck. Hearing Tr.

16   (5/3/2017) at 11:56 a.m., 12:26 p.m. Defendant expressed bewilderment that a handgun was in his

17   truck and stated many times that he was set up by the girl from the trailer, whose street name

18   Defendant said was Dopey. Hearing Tr. (5/3/2017) at 11:56-11:57 a.m. Much later, Officer

19   Robinson learned that an ATF investigation into the trailer was ongoing, and that investigation ended

20   up trumping his. Hearing Tr. (5/3/2017) at 11:56 a.m.[4]

21       Officer Robinson placed Defendant under arrest on his active warrant and transported him

22   to jail. Hearing Tr. (5/3/2017) at 11:57 a.m., 12:26 p.m. Throughout the service of the search

23   warrant, Defendant continually said he wanted to talk to Officer Robinson about how he did not put

24   the gun in the truck and the girl must have set him up. Hearing Tr. (5/3/2017) at 11:58 a.m.

25   Defendant wanted to talk "more and more," and give Officer Robinson any information he wanted

26

27       [4]Officer Robinson left information regarding the Crimestopper tip out of his paperwork for
     the instant case. He did not want the information given out in discovery, which could inadvertently
     inform the residents of the trailer that they were under investigation, and would have compromised
28   the integrity of the investigation. Hearing Tr. (5/3/2017) at 12:18-12:20 p.m.

about the trailer.  Hearing Tr. (5/3/2017) at 11:58 a.m.  Officer Robinson repeatedly told Defendant that he was too busy to talk, but Defendant kept volunteering information.  Officer Robinson was not asking Defendant questions or soliciting information from him.  Hearing Tr. (5/3/2017) at 12:28-12:30 p.m.  Officer Robinson told Defendant it was late at night, and he would come talk to him the next day if Defendant wanted him to do so.  Hearing Tr. (5/3/2017) at 11:58 a.m.  As Officer Robinson was putting Defendant in the car, Defendant again asked him to please talk to him and said he would give information about the trailer.  Officer Robinson said he was tired and would come see Defendant the next day.  Hearing Tr. (5/3/2017) at 12:30 p.m.

The next day, Officer Robinson went to speak with Defendant.  Hearing Tr. (5/3/2017) at 11:58 a.m., 12:31 p.m.  He did not initially read Defendant his *Miranda* warnings because Defendant had asked to speak with him, in reference to cooperating with a prosecution of the trailer in question.  Hearing Tr. (5/3/2017) at 11:58 a.m., 12:31 p.m.  Officer Robinson, therefore, went in with the intent of listening to what Defendant had to say about the trailer and what he could do in terms of cooperation, and not with the intent of interrogating Defendant about the handgun found in his truck.  Hearing Tr. (5/3/2017) at 11:58-11:59 a.m.  During the interview, however, Officer Robinson gave Defendant his *Miranda* warnings.  Hearing Tr. (5/3/2017) at 11:59 a.m., 12:32 p.m.  As Officer Robinson was questioning Defendant in order to determine if he could use him as a cooperator, Defendant made some statements about the gun, so Officer Robinson read him his *Miranda* warnings.  Hearing Tr. (5/3/2017) at 11:59 a.m., 12:32 p.m.  Defendant said he may have touched the gun with his pinky, and at one point he admitted he may have "grabbed it" before it was placed in the truck.  Hearing Tr. (5/3/2017) at 11:59 a.m.

On November 2, 2016, a federal grand jury sitting in Las Vegas, Nevada issued an indictment charging Defendant with one count of Felon in Possession of a Firearm, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).  Docket No. 1.  On February 13, 2017, Defendant filed the instant motion to suppress evidence, asking the Court to suppress all evidence seized during the traffic stop, as well as Defendant's statements.  Docket No. 18.  Defendant also requested an evidentiary hearing.  *Id*. at 26.

. . . .

## II.    ANALYSIS

### A.    Credibility of Witnesses

The Court ordered an evidentiary hearing in order to make an accurate determination of what occurred in the instant case and how the facts relate to the applicable caselaw.  "The longstanding and repeated invocations in caselaw of the need of district courts to hear live testimony so as to further the accuracy and integrity of the factfinding process are not mere platitudes.   Rather, live testimony is the bedrock of the search for truth in our judicial system." *United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012).  "[J]udges simply cannot decide whether a witness is telling the truth on the basis of a paper record and must observe the witnesses' demeanor to best ascertain their veracity - or lack thereof." *Oshodi v. Holder*, 729 F.3d 883, 892 (9th Cir. 2013) (internal citation omitted).  *See also See United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a significant disputed factual issue exists); *United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility").

During the evidentiary hearing in this matter, the Court had the opportunity to listen to the testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to weigh each witness' credibility.  Having done so, the Court finds that both witnesses testified credibly.

### B.    Motion to Suppress

#### 1.    Traffic stop

Defendant submits that officers must show that they lawfully stopped the truck he was driving.  Docket No. 18 at 6-7.  If they cannot do so, Defendant submits that all fruits of the traffic stop must be suppressed.  *Id*. at 4-5.

In response, the United States submits that the officers observed multiple violations of the Nevada Revised Statutes ("NRS") that allowed them to legally stop the truck.  Docket No. 20 at 7.  The United States submits that the officers observed Defendant operating an unregistered vehicle, in violation of NRS § 482.205.  *Id*.  Additionally, the United States submits that the officers observed Defendant NRS § 484B.413 by turning without signaling, and NRS § 484B.307(8)(e) by

1  turning through a parking lot to avoid a red light. *Id*. Once the officers observed even one of the

2  NRS violations, the United States submits, reasonable suspicion, if not probable cause, existed

3  sufficient for them to conduct the initial traffic stop. *Id*.

4  In reply, Defendant submits that the paper tag on his truck indicated that it was not expired.

5  Docket No. 22 at 3. Further, Defendant submits that the Ninth Circuit, in a 2002 case, held in

6  relation to a similar Arizona statute that traffic must be present and some possibility that the traffic

7  would be affected by the lack of signal must exist for the stop to be valid. *Id*. at 4. Finally,

8  Defendant submits that the United States fails to explain how the officers knew Defendant drove

9  through the parking lot to avoid a red light. *Id*.

10  The Fourth Amendment to the United States Constitution guarantees "[t]he right of the

11  people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

12  seizures." "Because stopping an automobile and detaining its occupants, 'even if only for a brief

13  period and for a limited purpose,' constitutes a 'seizure' under the Fourth Amendment, an official

14  must have individualized 'reasonable suspicion' of unlawful conduct to carry out such a stop."

15  *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (internal citations omitted). An

16  investigative traffic stop requires reasonable suspicion, not probable cause. *United States v. Twilley*,

17  222 F.3d 1092, 1095 (9th Cir. 2000); *United States v. Lopez–Soto*, 205 F.3d 1101, 1104–05 (9th Cir.

18  2000). "Reasonable suspicion is formed by specific, articulable facts which, together with objective

19  and reasonable inferences, form the basis for suspecting that the particular person detained is

20  engaged in criminal activity." *Twilley*, 222 F.3d at 1096. "[T]he constitutionality of a traffic stop

21  does not depend on the subjective motivation or intent of the officers." *United States v. Wallace*,

22  213 F.3d 1216, 1219 (9th Cir. 2000) (internal citation omitted). Therefore, "[t]he fact that the

23  alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances

24  justify the stop." *Id*.

25  A passenger "may challenge a stop of a vehicle on Fourth Amendment grounds even if []he

26  has no possessory or ownership interest in the vehicle." *Twilley*, 222 F.3d at 1095 (internal citation

27  omitted). Further, a passenger who establishes that the initial stop of the car violated the Fourth

28  Amendment can suppress evidence seized as a result of that stop as "fruit of the poisonous tree."

1 | *Id.*

2     In the instant case, the officers observed that the truck Defendant was driving was

3 unregistered. Though it had a paper tag on it, the officers know from their experience that many

4 paper tags in that area of the city are fictitious, and that the only way to know for certain if the tag

5 was valid was to stop the truck. Additionally, the officers observed the truck turn without using a

6 signal, which is a traffic violation.[5] Further, the officers saw Defendant turn into a private parking

7 lot while the traffic light was red, drive through the parking lot without stopping or slowing down,

8 and then turn right onto the main street, thus using private property to avoid a traffic signal, which

9 is a traffic violation. These facts clearly give the officers reasonable suspicion to believe that traffic

10 laws had been violated. Even if the officers had improperly stopped Defendant, however, the

11 attenuation doctrine applied once they found that he had a valid outstanding warrant. *See Utah v.*

12 *Strieff*, 136 S.Ct. 2056 (2016). Therefore, the Court finds that the stop was reasonable within the

13 meaning of the Fourth Amendment.[6]

14     **2.    Order to Exit Vehicle**

15     When "a motor vehicle has been lawfully detained for a traffic violation, the police officers

16 may order the driver to get out of the vehicle without violating the Fourth Amendment, ... because

17 the government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis'*

18 additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Arizona v.*

19 *Johnson*, 555 U.S. 323, 325 (2009). *See also Maryland v. Wilson*, 519 U.S. 408, 410 (1997)

20 (internal citation omitted) (an officer "may as a matter of course order the driver of a lawfully

21 stopped car to exit his vehicle...."); *United States v. Williams*, 419 F.3d 1029, 1030 (9th Cir. 2005)

22 (citing *Maryland v. Wilson*, 519 U.S. 408, 410 (1997)) ("it is well established that an officer

23 effecting a lawful traffic stop may order the driver and the passengers out of a vehicle").

24     The Court has found that the traffic stop was lawful. The Court, therefore, finds that Officer

25 Robinson properly ordered Defendant to exit the truck. *See Arizona v. Johnson*, 555 U.S. 323, 331

26

27       [5]The Court is not persuaded that the case cited by Defendant regarding an Arizona traffic statute applies to the relevant Nevada statute.

28       [6]The Court does not rely upon the Cybercrime tip in making this determination.

1   (2009).

2          **3.**       **Warrantless Search of Truck**

3        Defendant submits that the officers improperly searched his truck without a warrant.  Docket

4   No. 18 at 8.  He submits that the United States cannot show that probable cause existed to search the

5   truck, as the officers cannot credibly testify that they smelled marijuana and the smell of marijuana

6   coming from a car in Nevada does not establish probable cause.  *Id*.  Defendant further submits that

7   the amount of methamphetamine found in his passenger's pocket was small and does not combine

8   with the smell of marijuana to establish probable cause.  *Id*.

9        The United States responds that the overwhelming smell of marijuana, along with the

10  methamphetamine recovered from the passenger, constitute probable cause for the search of the

11  truck.  Docket No. 20 at 7.  The United States further submits that the warrantless search falls under

12  the automobile exception to the warrant requirement.  *Id*.  As probable cause existed, the United

13  States submits, the officers could justifiably search every part of the vehicle without a warrant.  *Id*.

14  at 8.  Further, the United States submits, the smell of marijuana in a vehicle established probable

15  cause even if a medical marijuana card had issued.  *Id*. at 9.

16       Defendant responds that, since marijuana is legal for medicinal use in Nevada, the smell of

17  it cannot establish probable cause for a search of the truck.  Docket No. 22 at 5.  Further, as the

18  officers in the instant case were state officer investigating state crimes, Defendant submits, they must

19  follow state law and not federal law.  *Id*. at 5-6.  Defendant also submits that the fact that driving

20  under the influence of marijuana is illegal does not justify the search, as anyone in the truck could

21  still legally possess marijuana.  *Id*. at 6.  Finally, Defendant submits that the officers did not

22  determine, prior to the search, whether Defendant or his passenger possessed a medical marijuana

23  card and, therefore, the smell of marijuana did not establish probable cause to search the truck.  *Id*.

24  at 6-7.

25       "A search or seizure effectuated without a warrant issued upon a probable cause is 'per se

26  unreasonable under the fourth amendment—subject only to a few specifically established and well

27  delineated exceptions.'"  *United States v. Bagley*, 772 F.2d 482, 490 (9th Cir. 1985) (quoting *Katz*

28  *v. United States*, 389 U.S. 347, 357(1967)).  "One such exception is the 'automobile exception.' "

1   *Id*.  Under the automobile exception, "a legitimately stopped automobile may be searched without

2   a warrant if those conducting the search have probable cause to believe that there is contraband in

3   the automobile." *United States v. Sanchez*, 944 F.2d 497, 498 (9th Cir. 1991).  Probable cause that

4   a vehicle contains contraband will also justify the warrantless search of any container located within

5   the automobile that could reasonably contain the contraband.  *Id*.  "If there is probable cause to

6   believe a vehicle contains evidence of criminal activity, [officers may] search ... any area of the

7   vehicle in which the evidence might be found." *United States v. Ross*, 456 U.S. 798, 820-821

8   (1982).  *Ross* "allows searches for evidence relevant to offenses other than the offense of arrest, and

9   the scope of the search authorized is broader." *Arizona v. Gant*, 556 U.S. 332, 347 (2009).

10  Warrantless searches of automobiles under the automobile exception are allowed for two reasons.

11  First, the ready mobility of a motor vehicle makes it impracticable for law enforcement officers to

12  secure a search warrant. *California v. Carney*, 471 U.S. 386, 390-391(1985).  Second, individuals

13  have a diminished expectation of privacy in motor vehicles because motor vehicles are subject to

14  pervasive governmental regulation.  *Id*. at 391.

15      Marijuana is legal for medical use in Nevada.  *See generally* NRS §§ 453A.010, et seq.

16  (legalizing medical marijuana).  Nevada's medical marijuana statute bars law enforcement from

17  basing probable cause solely on the fact that an individual possesses a medical marijuana registry

18  card. NRS § 453A.400. The statute, however, does not prevent law enforcement from considering

19  the odor of marijuana when they determine that probable cause exists.  *See id*.

20      It is illegal to operate a motor vehicle while impaired.  *See* NRS § 484C.110.  Legally

21  obtained substances, like alcohol and marijuana, may impair a driver.  The odor of marijuana, like

22  the odor of alcohol, may establish probable cause to search the vehicle for marijuana or alcohol.  *See*

23  *United States v. Parker*, 919 F.Supp.2d 1072, 1079 (E.D.Cal.2013) ("The odor of marijuana

24  emanating from a vehicle creates sufficient probable cause to justify a warrantless search of the

25  vehicle."); *United States v. Neumann*, 183 F.3d 753, 756 (8th Cir.1999) (holding that alcohol odor

26  provided probable cause to search vehicle for open container and smell of burnt marijuana justified

27  search of entire vehicle for drugs); *United States v. Mazzone*, 782 F.2d 757, 761 (7th Cir.1986)

28  (noting that odor of marijuana provides probable cause to search vehicle at least until likely source

of odor is found).

The Court finds that the strong odor of marijuana in a vehicle established probable cause to search the vehicle for contraband. *See United States v. Liu*, 2015 WL 163006, *5 (E.D. Ca. Jan. 7, 2015). Further, the officers did not have to determine whether one of the occupants of the truck possessed a medical marijuana card prior to conducting a search for evidence of marijuana in the truck when the officer has probable cause to believe the vehicle contains marijuana. *United States v. Phillips*, 9 F.Supp.3d 1130, 1138 (E.D. Cal. 2014). Although the Court finds that the strong odor of marijuana alone established probable cause, additional facts in this case added to the probable cause determination. The passenger had methamphetamine on his person, and a baggie was on the driver's floor board with white flakes consistent with methamphetamine around it. In light of the totality of the circumstances, the Court determines the police had probable cause to search the truck for narcotics, in any location where narcotics may be found. *See Phillips*, *supra*. *See also United States v. White*, 2016 WL 3010824 (D. Nev. May 25, 2016).

Once the officers found the handgun, they obtained a search warrant and seized the handgun. Defendant does not address the search warrant itself, he solely argues about the activities leading up to it in arguing that the gun should be suppressed. As the Court finds that the officers acted lawfully, the Court finds that the gun does not constitute fruit of any unlawful law enforcement activities.

### 4.    Reasonableness of Scope and Length of Detention

Defendant submits that the officers walked up to his truck, told him and his passenger to exit the truck, obtained consent to search them, searched them, searched the truck, and then obtained a search warrant. Docket No. 18 at 7-8. Defendant therefore submits that the officers did not address the traffic infraction and, as such, the scope and length of the detention were unreasonable. *Id*. at 8.

In response, the United States submits that the officers properly conducted all of the activities during the stop. Docket No. 20 at 6-9. In reply, Defendant submits that the United States did not address the issue he raised. Docket No. 22 at 4.

A seizure for a traffic violation "justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). "[A] relatively brief encounter," a routine traffic stop

is "more analogous to a so-called 'Terry stop' ... than to a formal arrest." *Id*. (citing *Knowles v. Iowa*, 525 U.S. 113, 117 (1998). *See also Arizona v. Johnson*, 555 U.S. at 330. "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop" and to "attend to related safety concerns." *Rodriguez*, 135 S.Ct. at 1614. "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Ultimately, the analysis remains one of reasonableness, and thus the court must examine the "totality of the circumstances" surrounding the stop to determine whether the length is reasonable. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir.2008).

Here, the Court finds that the officers acted reasonably. They lawfully stopped Defendant's truck. Upon walking up to the truck, both officers smelled an overwhelming, pungent smell of burned marijuana.[7] The occupants of the vehicle appeared extremely, uncharacteristically nervous. The passenger had methamphetamine on his person. Officer Chapman noticed a baggie on the driver's floorboard which, in his experience, was the type of baggie commonly used in that area for methamphetamine, and white flakes consistent with methamphetamine were around the baggie. Even while waiting for the records check to return from dispatch, the officers continued their investigative activities so as not to unduly waste time. Officer Robinson testified that approximately 15-20 minutes passed between the stop of the truck and the search. Further, Defendant attempted to extend the length of the stop by asking to speak with Officer Robinson that night on the scene. Officer Robinson declined to do so.

Although a lawful detention "can become unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of the stop, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), there is nothing in the record to suggest the officers detained Defendant longer than the amount of time reasonably necessary to complete the mission of this stop.

. . . .

---

[7] The Court finds the officers' testimony regarding the smell of marijuana credible, even though no marijuana was found in the truck. *See* Docket No. 18 at 9.

### 5.     Statement

Defendant asks the Court to suppress his statements from the night of the stop and the next day. Docket No. 18 at 15-26. Defendant submits that he did not receive *Miranda* rights on the night of the incident. *Id.* at 16. Defendant further submits that he did not receive *Miranda* rights the next day until the middle of his statement. *Id*. at 17-23. Finally, Defendant submits that the *Miranda* rights given to him were legally inadequate. *Id*. at 23-26.

In response, the United States submits that no incriminating questions were asked of Defendant on the night of his arrest. Docket No. 20 at 3. The United States further submits that it will not use any statements Defendant made while in custody the day after the incident at CCDC in its case-in-chief. *Id*. at 9. In reply, Defendant submits that he did not receive *Miranda* warnings the night of the arrest and, therefore, those statements should be suppressed. Docket No. 22 at 7.

Interrogation initiated by law enforcement officers after a suspect "has been taken into custody or otherwise deprived of his freedom of action in any significant way" must be preceded by *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *accord United States v. Wilson*, 666 F.2d 1241, 1246 (9th Cir. 1982). "In order to combat [the pressures inherent in custodial interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights." *United States v. Williams*, 435 F.3d 1148, 1151 (9th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467).

The "touchstone" for *Miranda* warnings is whether the suspect was in custody when interrogated. *United States v. Barnes*, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). To determine whether an individual was in custody, the Court must examine the totality of the circumstances. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The test is whether "a reasonable innocent person in such circumstances would conclude after brief questioning [that] he or she would not be free to leave." *United States v. Bassignani*, 575 F.3d 879, 883-84 (9th Cir. 2009) (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981)). A *Miranda* warning functions both to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause. *Id*. at 1151. Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his

1  rights before he incriminates himself, his statements may not be admitted as evidence against him.

2  *Id.* at 1152.  In determining whether a suspect was in custody, "the ultimate inquiry is simply

3  whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated

4  with formal arrest."  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*quoting California v.*

5  *Beheler*, 463 U.S. 1121, 1125 (1983)).

6       The Court finds that Defendant was in custody the night of his arrest when he made

7  statements to Officer Robinson.   The Court finds, however, based on the totality of the

8  circumstances, that Defendant was not subject to interrogation that night.  Defendant's comments

9  about the gun and the trailer were spontaneous.  Officer Robinson testified that Defendant repeatedly

10  tried to speak with him, and that he repeatedly told Defendant he would not speak to him at that time.

11  Eventually, Officer Robinson told Defendant that he would visit him the next day to speak with him.

12  As Defendant was not subject to custodial interrogation, therefore, he was not entitled to *Miranda*

13  warnings. [8]

14  **III.    CONCLUSION**

15       Based on the foregoing and good cause appearing therefore,

16       IT IS RECOMMENDED that Defendant's Motion to Suppress Evidence (Docket No. 18)

17  be **DENIED**.

18       DATED this 16th day of June, 2017.

19

20       _____
         NANCY J. KOPPE
21       United States Magistrate Judge

22

23

24

25   [8]Since the Court has found that Defendant was not subjected to custodial interrogation the
     night of his arrest, *Miranda* rights were not required and the Court does not reach the issue of
26   whether the rights given were adequate.

27       Further, as the United States has represented that it will not use the statements from the
     second day in its case-in-chief, the Court does not need to reach any issues surrounding those
28   statements.

1

2

3

**NOTICE**

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist*., 708 F.2d 452, 454 (9th Cir. 1983).